Good morning, Your Honor. May it please the Court? Philip Smith on behalf of the petitioner, Jose Tapia. Your Honor, this case, this is an immigration case that presents a very narrow, discreet legal issue that has not previously been decided by this Court. And that is, does a stop, a turnaround at the border, what is formally called a withdrawal of an application for admission, does that break the accrual of continuous physical presence for purposes of eligibility for cancellation of removal for a non-permanent resident? Now, the petitioner's position is that the issue is controlled by the recent Seventh and Eighth Circuit decisions, the Seventh Circuit in Morales-Morales v. Ashcroft, and the Eighth Circuit in Reyes-Vasquez v. Ashcroft. And the petitioner did submit those as supplemental citations to the Court. Your Honor, cancellation of removal is the statutory form of relief that replaced the former suspension of deportation in the 1996 changes to the law. And in that, Congress had four requirements for an individual who had been continuously physically present in the United States for ten years, is a person of good moral character, has not been convicted of a crime that renders them admissible removal from the country, and can show that it would be an exceptional, extremely unusual hardship to a U.S. citizen's spouse, parent, or child. The immigration judge can grant cancel of removal and allow that person to remain lawfully in the United States. In that statute, Congress also added specific requirements dealing with the continual physical presence requirement. Congress said that the service of a notice to appear to initiate removal proceedings would stop the accrual of continual physical presence. Also, the commission of a crime would stop the accrual of continual physical presence. If I could try to focus you more narrowly on what I think the real controversy here is today. I'd like you to speak to how this case fits or relates to or is governed by both our previous president, Vasquez Lopez, and the BIA's decision in Ramalda, Ramalez. Ramalez. Yes, Your Honor. Well, the question arose then, what effect, if an individual in this country is granted voluntary departure in lieu of being placed in removal proceedings, what effect does that have on continuous physical presence? And in Ramalez, the Board of Immigration Appeals said that when an individual enters into an agreement, essentially a plea bargain with the government, to leave the country in lieu of being placed in removal proceedings, in lieu of facing the threat of deportation proceedings, then that individual's continuous physical presence stops for that person when they depart voluntarily under that circumstance. The Board said that was consistent with the previous case law dealing with brief, casual, and innocent departure under the suspension case law and also it was consistent with the Attorney General's regulation under the Nicaraguan and Central American Relief Act, which dealt with a break in continuous physical presence for an individual who had been granted voluntary departure in lieu of removal proceedings. This court then, in Vasquez Lopez, applied Chevron deference to that decision and said that a voluntary departure under threat of removal proceedings breaks continuous physical presence. In this case, there was no agreement. The individual did not receive voluntary departure. The individual was stopped at the border. Now, in the Ramalez case, in the Vasquez Lopez case, the Attorney General's regulations, none of those refer to stops at the border. And the border has always been considered a different situation than voluntary departure from within the country. It's more flexible. It's less formal. An individual at the border has no right to a removal hearing. And as the Seventh and Eighth Circuits said, there's no evidence that the individual actually enters into an agreement, a plea bargain with the government, to leave at that point. In fact, they haven't entered when they're stopped at the border. The only departure here was the initial departure when the individual went down to Mexico in 1999. And that is also what the immigration judge found in his decision. He didn't find this was voluntary departure. He said this was a turnaround at the border. And there was nothing in the Vasquez Lopez case or the Ramalez case that suggested that the reasoning applied to a turnaround at the border. Well, how much discretion does the immigration judge have in a case like this to grant or to withhold the removal or treat it as not a departure? Well, if the immigration judge were to find that it didn't break continuous physical presence, it still is a discretionary factor that the immigration judge can take into consideration. So it's not that it's not considered. Okay, you say, and I'll ask the government the same thing, that the IJ does have some discretion. That is correct, Your Honor. Now, what's the standard of review by which we review the exercise of that discretion? Well, in terms of the legal question, it's reviewed de novo. Under the statute, the court does not have the authority to review the actual discretionary grant or denial of cancellation of removal. However, the court has determined that it can consider the nondiscretionary eligibility requirements, such as the accrual of the ten years of continuous physical presence. But the actual grant or denial of cancellation of removal, the statute says the court does not have the authority to review that decision. Well, what if we have a campesino comes up here, lives around Woodburn for seven or eight years, goes home to somewhere in the central part of the country, and attends a funeral, a family funeral, or has a quinceañera for a niece or something, and then he comes back and gets stopped. And, of course, he has no papers. So he turns around and goes back, or maybe gets on the bus and takes him back. A couple of weeks later, he comes back again. And then he turns up in this situation. And there must be thousands of people who grow up in a culture where you never get involved with the government if you can help it, never enter a public building if you can help it. And they get caught in this situation. Now, what is our standard of reviewing the decision of the I.J. who says, you've been gone too many times, or you've been gone too long, or this old stuff has got to stop, and he doesn't grant a withholding? If it's based on this statutory, if the immigration judge is saying you do not have 10 years of continuous physical presence, then that is a nondiscretionary eligibility requirement, which the court can review. The legal issue, de novo.  So is there substantial evidence to support the immigration judge's decision? But it has to be based on the legal standards that are established and what Congress said in the statute. Has the law changed on continual presence in the last 20 years? Because about 25 or 30 years ago, we started seeing a few cases where incidental family purpose visits back and forth across the border were just sort of ignored. And we said, no, he's basically, he's had three American citizen children up here. They're all in school in Woodburn, Butteville or somewhere, and they're getting along fine. And so we treat that as a non-event. There were some cases like that. Now, has that law changed? Well, that law did change in 1996, because there was a statutory exception for a brief, casual, and innocent departure. And so the case law interpreted those types of departures as brief, casual, and innocent. Well, and it was replaced by this cancellation of removal section, which said a departure of less than 90 days or departures in the aggregate of less than 180 days do not. Well, actually, it says if it's a departure of more than that time, then that breaks continuous physical presence. And part of the problem here is it's written in the other direction. So it doesn't quite it. It implies but doesn't really create a safe harbor saying if you're under this measure, you're OK. What the statute said is if you're over this point, you're definitely beyond the pale. That is correct. And so and that's where I think beneath that is where you although I don't know whether it's intended to give discretion to the immigration judge, the statute at least is not explicit in saying what the bright line is. That's correct. It's not explicit. And that's where the board looked to this. These the previous case law interpreting brief, casual and innocent departure and applied it to the voluntary departure sense. But even under the old case law, it's never been applied to a stop at the border. As that breaking continuous physical process. Well, I realize we're running past the time, but we're sort of doing two cases at once here anyway. What what is the in the real world? What what is going on when a person is stopped at the border and and goes back? And there's some there's something coercive about his going back. It's not entirely casual or brief. Well, at the border. And there's a different statutory section that deals with inspection and admission at the border. It's much less formal than it is here. I mean, sometimes individuals are caught in the desert, sometimes on the seas, sometimes physically at the border. The statute gives the inspector the right to allow the individual to withdraw their application for admission and leave. Or to enter an expedited removal order if the inspector determines that they don't have papers. So there can be a formal expedited removal order. Most of the time, there's not a formal there's not a formal order. It is like this case. The person is turned around, put back on the bus. Isn't there an advantage to the person who gets to go back right away because they come back right over again the same day? I'm from San Diego. One year we had five hundred thousand caught in San Diego County. So it's something to just go over and come back and forth like ping pong. So isn't there an advantage to be let go right away? Go across and you come right back. There is an advantage. Certainly. That's where Congress in the statute said that if if the person's outside the country for 180 days, then that stops continuous physical process. But even less than 90 days, you can still stop it. It depending on the on the character of it. That's what the Ninth Circuit held. And the end bank wouldn't wouldn't hear. Right. If it's a you mean the Vasquez Lopez. Right. If it's voluntary departure from if it's a voluntary departure where there is a formal agreement between the individual, then yes. What evidence and who has a burden of proof that there is or isn't an agreement in this case? There is the only evidence of record is there was some entries into the computer system that there was a withdrawal, but there was no evidence that there was voluntary departure granted. The Seventh and Eighth Circuit placed the burden on the agency to demonstrate that there was a voluntary departure agreement. Absent that, this court has accepted the testimony of the individual as to what happened. Absent some evidence on the other side to show that there was a voluntary departure. So he just said they turned me around and I went back. Or did he say anything? In this case, yes, that that is what happened there. There was four different turnarounds in this case. Right. And there is there is evidence that he was stopped four times. So you say under those circumstances, he didn't know that he was being then wasn't going to be deported. There was no there was he did. There wasn't an agreement. Yes, he didn't. That wasn't the understanding. But in terms of now, this can be considered by the immigration judge as a discretionary factor. But not as a threshold eligibility requirement. And in this case, there was really only one departure, and that was the initial departure. And all the others was a refusal to enter the country. And we're saying that that didn't break the continuous physical presence as a threshold eligibility requirement. Well, when you say in the country, where is in the country, because at the border of San Ysidro, there's kind of a no man's land between 50 yards wide that Mexico lines there. And then the immigration offices are 50 yards in or 50 feet in. Well, when do they get into the country? Well, that would then go back to the to the to the the inadmissibility statute. And under the statute, the individual has if they're caught at at the border within a certain range of the border, then the individual has the burden to show that they have been physically present in the United States for the past two years, or they can be treated as an applicant for admission. Does have any more questions? I'll give that aside. We'll give you an opportunity for rebuttal. Thank you, Your Honor. Good morning, Your Honors. May it please the Court. William Irb from the Department of Justice representing the respondents in this matter. I'd like to address a few points brought up by your initial question to Petitioner's Counsel. One is the statute, the standard of reviews that should be used in this case. Any findings of fact by the immigration judge should be upheld under substantial evidence rule. And that's been set forth in the statute as well as by Supreme Court and Zacharias. As to questions of legal finding, it's de novo with deference based on a Chevron analysis. In addition, Your Honor, I think there's two main issues in this case. One is whether or not the individual petitioner in this case was granted voluntary departure. And second, which is a factual finding, and second is whether or not his being granted voluntary departure was under the threat of being placed in deportation proceedings, which is basically a legal question, Your Honor. Reviewing the facts in this case, it's incredible that Petitioner would argue that his continuous physical presence was not interrupted after the alien left in December of 1999 and then tried to re-enter the United States on four separate occasions in the month of January of 2000. In the first entry that the alien did, he presented himself at a port of entry, not going across the border clandestinely, but at the port of entry, where he submitted fraudulent documents trying to establish that he, in fact, was a United States citizen. He was detained for four hours, fingerprinted, photographed, placed in a computer system, and then returned to Mexico. And he was given the opportunity to withdraw his application of admissions. Clearly, in that situation itself, he was granted voluntary departure, and he was clearly under the threat of being placed in deportation proceedings. But what's the agreement? The agreement, Your Honor, is that he returns, while the government's part of the agreement is that they don't have to place him through proceedings. That's a very simple agreement. And this court for years has upheld that agreement when voluntary departure occurs at the border. Does the record contain any agreement? Any specific handwritten agreement? Right. No, it doesn't. Any documentation at all with regards to the agreement being made? There's no written, formalized agreement. Okay. But there's the Department Immigration Naturalization Service deportation officer, Mr. Allen, testified that the alien was apprehended four times, fingerprinted, detained, and was given the option of voluntary departure. So the agreement wasn't that the government wouldn't deport him. The agreement was that they allow him to withdraw his application. That was on the first instance, Your Honor. The other three instances occurred at the border. There was no – he was not submitting an application at a port of entry. But what was the agreement then? The agreement was that we – if you agree to go back to Mexico, we will not place you in immigration proceedings. And that's a very important – let me interrupt you for a second, Your Honor. Let me go on with that thought. That's a very important factor in this case, because at the time that the petitioner was caught at the border, if he would have been placed in proceedings, his accrual of continuous physical presence would have been stopped right there. So to say that he had no concept of what was going on I think is sort of a fallacy, because at that point, under the stop time rule provisions provided in Section 248D1, when you're served with an NTA, your time – your ability to accrue time in the United States stops right there. And so to say that these alias have no concept – But what's the point of that, though? Because you're trying to say, in effect, that it stops right there anyway. I mean, it's not like he's given the option to avoid that result. Well, it is. It's an option. He can stay, or he can leave and not be placed in proceedings. And from his perspective, he's getting a deal at that point, because under the law, he would already – his time would stop right there at that border as soon as they placed him in proceedings with the service of an NTA. But if I understand your position, you're telling us his time stops right there as soon as he accepts the agreement and crosses the border again. No. His time stops when he's served with the NTA under the stop time rule. That's one way under the statute it can stop. The Board and this Court has held that when it's under the threat of deportation, the same thing occurs at that point, that his purposes for accruing continuous physical presence stops when he accepts voluntary departure. He can no longer accumulate it outside the United States. And, in fact, the Board and this Court decided that that makes inherently a lot of sense, because if the alien was able to accrue time outside of the United States after accepting the agreement, it would make meaningless Section 240A of the Act, because he would avoid being served with the NTA, leave, not being placed in proceedings, which then would – if he was placed in proceedings, his time would stop. If you were to read it the other way, he would be able to leave the United States, accrue more time, and sneak back in the border and not get caught. And, second, I would also argue, Your Honor, as a matter of law, regarding the issue of whether or not this was – this agreement is under the threat of being placed in deportation proceedings, I would point the Court's attention to the Attorney General's authority to grant voluntary departure. Under Section 240B, I believe it is, in which the Attorney General only has two options. According to the statute set by Congress, which is either place the alien in proceedings or grant involuntary departure. So, as a matter of law, Your Honor, when this deal is struck at the border, it is under the threat of being placed in proceedings. And these are the two issues that we have in this case. Why shouldn't we follow the Seventh and Eighth Circuit? The case – for that reason, Your Honor, for the two reasons I just said. One, the Seventh Circuit does not address the inherent – the question of matter of law of voluntary departure, the Attorney General's option of placing him in proceedings and not placing him in proceedings, granting voluntary departure. They don't address that as a matter of law. Second, we just feel that this Court and Romales have basically gone the other way. This Circuit has agreed that if you're under voluntary – if you're under the threat of deportation and you accept voluntary departure, then your time for accruing time has been interrupted. That's the problem I'm having. How is he under threat of deportation if they just send him back? That's not what we have in this case, Your Honor. We have him being granted voluntary departure factually and as a matter of law under Section 240B of the INA. So we have two – we have a factual scenario. He admits that he was returned four different separate times. We're talking one time. This is not the brief casual instance. It doesn't mean he's no longer in the statute. Four separate times, one with fraudulent documents to try to enter the United States. Well, the brief casual is about the absence. Now we're on the other side of the problem. Yeah, in fact, brief casual is no longer even an issue in the statute. I mean, it's gone through a variety of formations, but it's clearly out. Well, the statute now gives this anti-safe harbor. That is, what's beyond the pale? And he's certainly not up to the 90-day point. Yeah, he's not within the 90 or 180 days. But this Court has held that that's not the only opportunity in which your time is extinguished for accumulating continued physical presence. Maybe I'm missing, but how is he under a threat of deportation under the facts of this case? Or how does he know he's under a threat of deportation under the facts of this case? How does he know? Well, isn't that what the Seventh and Eighth Circuit said? He has to know. The agreement has to know what the agreement is. I think there has to be – there has to be – that he was placed under the threat of deportation. Well, that's my question. Right. In this case, this case is completely different from those cases, Your Honor, factually. In Morales-Morales, there was one instance in which the alien was turned around. Let's back up here. And so you're conceding that there was no threat of deportation in this case. Is that right? No, absolutely not, Your Honor. Based on the implicit agreement between the alien and the service, and also as a matter of law, when the Attorney General offers that agreement, either voluntary departure – You've admitted it was a different agreement. It's not an agreement not to be deported. It's an agreement to allow him to go back. No, it's an agreement not to be placed in proceedings. Either – here's the agreement. You stay in the United States, we detain you, or you go back. Right. But that's not a threat of deportation. Yes, it is. At that point, you're placed in proceedings. The question is not a threat of deportation, Your Honor. The issue is a threat of being placed in removal proceedings, which stops the approval of continuous physical presence. You're always under the threat of deportation when you come to the United States unlawfully. The question is, under this statute, Section 240A, is there the threat of being placed in proceedings, and also whether or not there was a grant of voluntary departure? So what you're saying, any time you turn it around, then they know that there's a threat of deportation. Is that right? That's correct. I mean, of course, these individuals are arrested, detained, fingerprinted, photographed. How can you assume that this person doesn't know that – he knows he's illegally entering the country. He knows of the ramifications. He's been arrested. We have a deportation officer who reviewed the record in this case in the computer printouts that says that the alien was granted voluntary departure. I mean, it's in the record. Voluntary departure, not voluntary return, not turnaround. And if I remember correctly, during the hearing, the petitioner admitted on several occasions that he was returned to Mexico. He doesn't refute that. I mean, if you want to speak about a real-world situation, you know, let's remove the veil here. You have people coming in the United States illegally. They're caught. In this case, which is different from Morales and others' cases, there's substantial evidence indicating that an individual was detained, threatened with being placed in proceedings. An implicit agreement, either you take it or you're placed in proceedings or you return to Mexico. And I would argue that also an important factor is that if this alien had agreed to be placed in proceedings, he would have no form of relief under cancellation because he came in the United States originally in 1991, and if he would have taken the original deal in December of 1999, he would not have accumulated his 10 years' physical presence. I guess what – I'm having trouble coming up with a line, and maybe it's because in the big picture we've got different – really different interests being served. I mean, we have the statute that makes clear that being outside the country – and at one point the Supreme Court talked in very bright-line terms. You're outside the country, that's the end of the continuous physical presence. That's correct, Your Honor. And the law was changed. And so now we have this reverse safe harbor where you've got a point beyond which the absence is too long. We're nowhere close to the 90 days or the 180 total days based on the record we have here. So from the perspective of the time that proceedings actually began against him, he had his 10 years, and the duration of his absence was not significant enough to prevent that from being continuous physical presence. Now we have this other factor, which is the, I guess, protection of the border factor. And I understand our case in Vasquez would speak specifically about entering into an agreement where you – it says, free to depart and not return other than in accordance with the entry process applicable to all aliens. It sounds like a more formal kind of agreement, and certainly we're bound by that decision. So I can see, well, that's different. If the person says, okay, I won't do this anymore, then that's that. Well, now we seem to be someplace in between that. And the end result is almost like a kid's game where you're playing tag. If you're out of the country, if you can get back in successfully, then it's okay. But if you get tagged on the way in, then it's not okay. And none of that has anything to do with the perspective we have years later in terms of whether there's 10 years continuous physical presence. So is there a handle I can grab onto here that explains why the line should be at one place instead of the other? Yeah, I think the line is really the rule of law, Your Honor, and Congress's passing of Section 240A, and it's changing manifestations over the different years. You know, we have a situation that if we were to find that his voluntary departure does not cut off his time, then it would make other sections of the statute meaningless. But we know under 240A that being outside the country doesn't automatically cut off continuous physical presence. That's a statute that says if you departed for more than 90 days, you're cut off. You can't avoid the inference that some period of time less than that means you're not cut off. And why the issue of whether you're successful in slipping in without being detected or not has anything to do with the duration of absence. I understand your point, Your Honor. The point is the fact that the statute provides that your continuous physical presence can be terminated or interrupted in a variety of situations. For example, commission of certain crimes terminates your 10-year physical presence right there. Being served and placed in proceedings continues your physical presence. And that's a small point, an important distinction to make here. And that is under suspension, you can still accrue time at one point, even if you're placed in proceedings. Congress is basically trying to whittle down the alien's ability to stay when he's jumping back and forth across the border. The easiest way for Congress to do that is to say if you're outside the country, that's the end of it. Go back to what the Supreme Court said, and yet Congress clearly didn't say that because it changed the statute after that. That's correct. I mean, we had the original suspension where you stepped outside, it was over. And then there was the brief, casual, and innocent. Now Congress has tightened that back up and provided that if you're out of the country for 180 days or 90 days, you're certainly out. And then they provided the service to the NTA, certain crimes. But also the board and this court have found that any time less than that is also the possibility of interrupting continuous physical presence for purposes of cancellation of removal. Now, I believe that this court should defer to the board of immigration's interpretation of Section 240A. In fact, this court has in Vasquez Lopez. The real issue, Your Honor, I think here is whether or not it was under the threat of being placed in removal proceedings. And that's where this implicit agreement comes up at the border. Well, is there any situation where the alien trying to slip back into the country comes into contact with not even border patrol, any official law enforcement type, in effect gets bounced back into Mexico other than slipping away himself when he sees the border patrol officer? You know, for example, in the news race, we saw the news about the Minutemen, for example. I mean, yeah, that kind of thing could be happening. You could have sheriffs on the Texas border, you know, exercising INS authority, which it shouldn't be doing. I mean, I'm sure there's all kinds of events going on. I do just think, I mean, the Minutemen type, they don't have any colorable legal authority. Exactly. So I take those out, but I want to be on the border patrol officer because you get picked up by a sheriff's deputy who can arrest. There's nothing to prevent the sheriff's deputy from bringing him to the border patrol and having the service proceed thereafter. So at that point, could it be said if the sheriff's deputy says, OK, go back or I'm taking you in, does that become under the threat of deportation that you're talking about? I would say under the statute, no. It's only the border patrol that's able to enforce the. Any contact with the border patrol that causes the alien to withdraw or be rebuffed is under your position sufficient to terminate the tenure or the running of the continuous physical. Right. As long as there's the understanding of being placed in deportation proceedings or taking voluntary departure. And this case is that is distinguishable from the seventh and eighth, because we have a significant amount of record evidence showing that the alien entered four times, was placed and was was arrested, detained and all those kinds of things, as I stated earlier. I want to be sure I understand you. Yes. You're saying it's a threat of deportation isn't required. It's a threat of removal is enough. And that's what distinguishes the seventh and eighth circuit cases. All right. No, I think what I mean, that that's a correct statement of law from the Department of Justice position is that it's under the threat of the threat of being placed in deportation proceedings. However, the difference of a removal enough as distinct from threat of deportation enough. I think you're almost the same, Your Honor. But I think we're reading this case. Getting back to are they synonymous? Probably not. How are they different? One is a formal proceeding being placed. The threat of being placed in deportation proceedings rather than, you know, you may be found a portable. And I think the term deportation has essentially been replaced by the term removal. So I understand your reluctance to say they're the same. That's correct. In practical terms, it simply reflects whether you're under the old statute or the new statute. That's correct. But really, I mean, this circuit and the board look at the issue of whether or not it was under the threat of being placed in removal proceedings. And that's an important point, because if you are placed in that proceedings, your ability to accrue continual physical presence in the United States has been shut off right there. And then so that's one. And if we were to agree otherwise, then that becomes meaningless, that section. And also it becomes meaningless with the whole notion of the concept of the deal. The deal is to remove the alien as quickly as possible to get one more illegal alien out of the United States without a burdensome cost on the United States government. I mean, if there wasn't an inherent deal here, then there would be no benefit to the government. We would have to place every single one of these people in proceedings. But the statute under Section 240B, under the voluntary departure provisions, allows the attorney general to make that determination. In fact, it requires him to do one of two things only, place them in proceedings or give them voluntary departure. And our position, Your Honor, is at that moment at the border, it's a matter of law. There's the option, one of those two. So you're saying I'm reading from the Eighth Circuit right now. It says if the alien in that case was simply returned to the border without voluntarily departing under an express threat of deportation or removal proceedings, his departure did not constitute a break in the continuous physical presence. You're saying that statement is wrong. Is that right? Under this under this circuit's case law and under interpretation of the board's interpretation of Section 240. And really, I think what they're talking about, those cases are distinguishable because there's no factual basis of even giving an indication there was an implicit agreement between the two parties. Well, in the case they're talking about, he was picked up. He was briefly detained. He was fingerprinted, placed on a bus heading back into Mexico, and then he reentered the United States again. What's the difference between that and us? I'm sorry? What's the difference? We have an individual who testified on behalf of the agency, a deportation officer, and there's four occasions of that happening. And plus, there's another difference, that when he presented himself at the border, at a port of entry, rather than trying to come across the border, he was turned around, sent back to Mexico. And this is all established by testimony in the record, Your Honor. I mean, of course, the Eighth Circuit case is a little bit stronger for petitioners rather than, in fact, the Seventh Circuit case. Because in that case, there was basically no evidence that the court could believe that an implicit agreement had been made between the government and the alien. I mean, that's the more evidence you have, the more ability to understand that there might be an implicit agreement going on at the border. Any further questions? I've gone way over my time. We'll give you a couple minutes for rebuttal. I'll say to the people waiting, we usually pay stricter attention to the time limits, but in this case, as Judge Goodwin alluded to, this is actually an argument that covers multiple cases. And if I thought about it in advance, I would have issued an order changing the time, but I didn't. We'll do it on the fly. Your Honor, we do have a profound disagreement as a matter of law about the Attorney General's authority to issue this voluntary departure. And if I could point you to the statute, the voluntary departure statute, which is 8 U.S.C. 1229 C small a Roman numeral 4, and it says treatment of aliens arriving in the United States. And that section says for an alien arriving in the United States, voluntary departure does not apply. So, in fact, the Attorney General is not, as a general rule, authorized to grant voluntary departure, as a matter of law, at the border. And the alien at the border does not have an option or a right to be placed in removal proceedings. And the Attorney General, if the Attorney General wants to refuse, the inspectors want to refuse aliens to enter the United States, the option is not to place them in formal removal proceedings. Now, who counts as arriving at the border or, in this case, arriving in the United States? I can understand if you appear at the port of entry and say I want to get in, but if you're picked up trying to cross between the stations on your own, you're actually picked up on United States territory. Is that going to be within the section or subsection 4, arriving in the United States? That is, because then if we go back to the statutory section that deals with inspection and admission at the border, and that is 8 U.S.C. section 1225A1, and there it says an alien present who has not been admitted or who arrives in the United States whether or not at a designated port of arrival, and it includes an alien brought to the United States after having been interdicted in open water, so if they were caught at sea. So then you fall within this inspection and admission, this border area, where the Attorney General is not required to institute formal removal proceedings. They can summarily refuse admission. They can summarily order the person removed or deported. And that's significant because when we go back to this issue about has the person entered into a voluntary agreement, has there been a plea bargain, the individual within the country has some sort of choice in the matter. They can leave voluntarily or they can be placed in removal proceedings. So in Tapia's case, he was just refused admission, wasn't he? He was. One time he was refused admission. Three times he was stopped trying to cross not in the line. So he was refused. He was de facto refused admission. Four times. Yes. And now when we go back and the Seventh Circuit, the Morales case, that individual was stopped four times. In fact, on the fourth time was actually convicted of illegal reentry and served a sentence before their proceedings. And the Seventh Circuit still said that there was no formal, there was no agreement, there was no evidence that there had been an agreement to accept voluntary departure and that the continuous physical presence had not been broken in that case. And just the final point, factually, the immigration judge in this case did not find that the person had been granted voluntary departure. The immigration judge actually in his decisions characterizes it as a turnaround at the border. So he factually didn't find it was a voluntary departure. Thank you. We thank you. We thank both counsels for their excellent arguments. The case is submitted and we will proceed to the next case, which raises a related issue. Evara Flores versus Gonzalez.
judges: Goodwin, Clifton, Rhoades